# Illinois Official Reports

## Appellate Court

---

### *Flood v. Wilk*, 2019 IL App (1st) 172792

---

| | |
|---|---|
| Appellate Court Caption | ERIC FLOOD, Petitioner-Appellee, v. CHESTER WILK, Respondent-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2792 |
| Filed | February 7, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2017-OP-020404; the Hon. Callie Lynn Baird, Judge, presiding. |
| Judgment | Vacated in part. |
| Counsel on Appeal | Jeffrey R. Esser, of Chicago, for appellant.<br><br>Gene H. Hansen, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Burke and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1       The instant appeal arises from certain relief awarded to petitioner Eric Flood in connection with a stalking no contact order entered by the trial court pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2016)) against respondent Chester Wilk. Specifically, respondent challenges the trial court's entry of an injunction preventing him from "communicating, publishing or communicating in any form any writing naming or regarding [petitioner], his family or any employee, staff or member of the congregation of South Park Church in Park Ridge," where petitioner is the pastor. Respondent argues that such a restriction violates his constitutional right to free speech; respondent is not challenging any other portion of the order.[1] For the reasons set forth below, we agree with respondent that the order as drafted is overly broad and runs afoul of constitutional concerns, and we vacate that portion of the trial court's order in paragraph (b)(5) that states the following: "Respondent is prohibited from communicating, publishing or communicating in any form any writing naming or regarding [petitioner], his family, or any employee, staff or member of the congregation of South Park Church in Park Ridge, IL."

¶ 2                                                    BACKGROUND

¶ 3       On August 17, 2017, petitioner filed a petition alleging that there had been a significant increase in unwanted contact in the last two months by respondent towards petitioner that had caused increased anxiety to the staff of the church, the congregation, and the neighborhood. The petition set forth details of three separate incidents occurring between June 27 and August 6, 2017, all of which occurred at South Park Church. The first incident occurred on June 27, 2017, and consisted of respondent visiting the office of the church, where the staff "had previously been advised not to allow [him] entrance to the building." The receptionist notified a staff member, who went outside and asked respondent to leave. After giving the staff member a copy of his book, respondent left.

¶ 4       The second incident occurred on Sunday, July 2, 2017, and consisted of respondent distributing disparaging letters on the windshields of automobiles in the parking lot of South Park Church during one of its morning services. The next morning, petitioner reported the incident to the Park Ridge police.

¶ 5       The third incident occurred on Sunday, August 6, 2017, and consisted of respondent again distributing disparaging letters on the windshields of automobiles in the parking lot of South Park Church during its second worship service. A church member observed respondent distributing these letters and informed a staff member, who asked respondent to leave. In response, respondent "declared he had a right to be there until the staff person said she would call police."

¶ 6       In addition to the three specified incidents, the petition contained a "History" section detailing respondent's alleged conduct. In this section, petitioner alleged that "[respondent] has been attacking my reputation and the reputation of South Park Church (among many other people and organizations) for ten years. A letter was sent to [respondent] from the

_____

[1]The order further prohibited respondent "from knowingly coming within, or knowingly remaining within, 500 feet of Petitioner's residence" or the church where he is employed. Respondent does not contest that portion of the order in this appeal.

leadership of South Park Church in February, 2007, stating the following: 'Please do not call, visit, or write additional letters to us regarding the issues mentioned above.' Yet erratic contact has persisted for a decade." Petitioner alleged that this activity included (1) "[s]ending letters repeatedly to addresses of current and former members of South Park Church found in an old church directory," (2) "[s]ending unwanted emails to South Park Church staff with content parallel to his letters," (3) "[g]oing door to door to neighbors of South Park Church to deliver letters," (4) "[r]epeatedly asking for appointments with [petitioner] even though he [was] repeatedly told no and asked to cease all contact," and (5) "[d]istributing flyers in the parking lots of Walgreens at Devon/Talcott and Mariano's [at] Cumberland/Higgins."

¶ 7        As an example of one of the fliers in evidence that respondent distributed, one bears the heading "South Park Church and [petitioner] is a corrupt church which needs to be thoroughly exposed. Here's why." The flier claims that petitioner "is a disgrace to Christianity" because he refused to suggest marital counseling when respondent's wife left him after 40 years of marriage.

¶ 8        Respondent repeatedly referred to petitioner and his church as "corrupt" and used petitioner's conduct as an example of "how the devil gets into churches." For instance, in an August 6, 2017, letter, respondent stated that, due to petitioner's actions, respondent "was compelled to write and publish the book entitled, 'The devil's intervention into healthcare, politics, churches, courts and families.' " (Emphasis omitted.) Respondent also stated that petitioner "cannot be that stupid but he sure can be that influenced by the devil according to the Bible."

¶ 9        Respondent also explained how, as a child, "[he] had [his] entire future completely outlined in fine detail with over 20 predictions well over 60 years in advance with 100% accuracy and never once wrong." Respondent believed that the family friend who provided these predictions was his "guardian angel sent by God" and that "God gave [him] a glimpse into [his] future and a responsibility to use [his] accurate and supernatural information so [he] could realize that there is a God in heaven and a devil in hell."

¶ 10       These same sentiments appear in a July 2, 2017, letter, in which respondent also notes, with respect to the predictions: "I could not have gotten such fine detailed predictions without Divine Intervention, and I can back up every word I say here with a polygraph test. *** I received a gift which I can use to destroy any atheist in a debate with scientific proof that should satisfy the most hard-nosed scientist. I will challenge any atheist and I will clean their clock big time. That is if any is willing to challenge me. What I will be using is called the Science of Probability. Unfortunately some of our pastors have blinders on and can't see it. Maybe this message will open their eyes as I am compelled to fulfill my destiny which was predicted since I was a child. *And believe me it will happen!*" (Emphasis in original.)

¶ 11       On December 13, 2009, respondent sent a letter to "the entire staff at South Park Community Church," which included as enclosures correspondence between respondent and a California court, where respondent was apparently engaged in court proceedings concerning his estranged wife. One enclosure was entitled "Cover Letter" and included bullet points refuting his wife Ardith's claims: "1) Regarding Ardith's concern of my going to California"; "2) Regarding Ardith being fearful of me as having a mental illness"; "3) Regarding Ardith claiming I am talking about fulfilling prophesies"; "4) Ardith alleges that I said she is 'possessed' by the devil"; "5) Ardith alleged that I would 'fix' her";

"6) Ardith and her daughters keep insisting I am egotistical and narcissistic"; "7) Ardith alleges that I am Delusional"; "8) Ardith noted that South Park Church 'banned' me from going there"; "9) Regarding being 'unloved' by [respondent]"; "10) Regarding Ardith's accusations about [respondent] swearing"; and "11) [Respondent] claiming the devil is influencing the family." This communication to the California court also noted that one of respondent's daughters had obtained a restraining order against respondent, claiming that she "could not sleep nights and felt intimidated by her dad." The "family history" portion of the communication ended by stating: "The real message to be gotten here is that this is *spiritual warfare* between GOOD and EVIL. The facts speak for themselves in the eyes of God and reasonable minded people." (Emphasis in original.)

¶ 12    The petition also contained a section entitled "Effects of the Incidents on Petitioner," which provided that "[s]taff members and church members have expressed increased concern for the reputation of the church and increased anxiety about keeping our congregation safe. My family, our staff, and our church leaders are concerned for their own well-being as well as that of our congregation. The obsessive nature of the criticism makes us fear a future elevated response by [respondent] that could cause disruption of ministry or worse." Petitioner further alleged that "[t]here are many untrue statements made in the letters that discredit me. Though many people disregard the letters due to their bizarre and ranting nature, it also raises questions among others that undermine my credibility." Finally, petitioner alleged that "[e]very letter and visit by [respondent] is an unwanted distraction and excessive waste of time as we answer questions and respond to concerns."

¶ 13    On the same day, the trial court entered an emergency stalking no contact order, prohibiting respondent from threatening to commit stalking or committing stalking; from having any contact with petitioner; and from knowingly coming within, or knowingly remaining within, 150 feet of petitioner's residence or place of employment. The trial court also set the petition for a plenary stalking no contact order for hearing on September 12, 2017.

¶ 14    Respondent filed a *pro se* appearance and, on August 22, 2017, filed an answer in which he faulted petitioner for failing to recommend to respondent's estranged wife 10 years ago that she engage in marital counseling with respondent. Attached to the answer was a letter drafted by respondent addressed to the trial court. In the letter, respondent claimed that petitioner would not explain to him petitioner's refusal to recommend marital counseling other than telling him that it was " 'personal and confidential.' " Respondent claimed that petitioner also complimented respondent's wife "for 'having the courage to do what she did.' " Respondent claimed that he had contacted petitioner "numerous times over the past ten years and he refused to budge. I told him 10 years ago I would never cease contacting him and I meant every word. I am doing now what I said I would do over the past ten years." Respondent claimed that he had written a book entitled " 'The Devil's Intervention' " and included a chapter on churches "because of [petitioner] and South Park Church and their wrongful conduct." (Emphasis omitted.) Respondent claimed that "[e]nough was enough. Now he has the audacity to take me to court and try to stop me from showing to the world what he did wrong. Unless he renounces what he did wrong in the strongest possible terms[,] I will continue." Respondent admitted in his answer to printing fliers and distributing them throughout the neighborhood and alleged that "after I get on talk shows I will bring up [petitioner] and South Park Church as an example on radio and TV." Respondent claimed

that "[petitioner] is worried about his reputation in Park Ridge but refuses to acknowledge that he contributed to destroying a 40 year old marriage and stone-walled me for ten years. This deserves to be made public nationwide and I do not intend to stop unless he renounces what he did wrong in the strongest possible terms. I want the entire world to know about [petitioner] and South Park Church did [*sic*] because the message is more important that the messenger. This should have never happened." (Emphasis omitted.) Respondent also attached a copy of a polygraph exam that he had undertaken in 2011, claiming that its results were in support of his answer.

¶ 15    On September 12, 2017, the trial court entered another emergency stalking no contact order and, on October 3, 2017, the matter came before the trial court for an evidentiary hearing. At the hearing, petitioner was represented by counsel, while respondent proceeded *pro se*; the record reflects that the trial court had previously continued the hearing *sua sponte* so that respondent would have the opportunity to retain an attorney but that respondent had not done so. At the hearing, petitioner testified that he was the senior pastor at South Park Church and had been a clergy member at the church for 13 years. In 2006, respondent's wife, who was a member of the church, sought counsel with petitioner. Petitioner testified that respondent's wife "was afraid of her safety, so she left her home" and called petitioner afterwards; petitioner attempted to provide her with pastoral support. Several days later, respondent visited petitioner "to express his side of the issue." Respondent wanted petitioner to tell his wife to return, but petitioner "felt like what was more advantageous was to help him, and [petitioner] referred [respondent] to a professional counselor." After visiting the counselor, respondent returned and "demanded that [petitioner] tell his wife to return."

¶ 16    Petitioner testified that respondent began repeatedly sending letters to church leadership claiming that petitioner did not support marriage and was "a tool of the devil." The church leadership requested that respondent cease these communications, but he did not; petitioner also complained to the police, but that also had no effect on respondent's behavior. Petitioner identified a February 3, 2007, letter that was sent to respondent in which petitioner, who was an associate pastor at the time; the senior pastor; and the chairman of the board requested that there be no more visits from respondent with respect to petitioner or the church. Petitioner testified that respondent continued contacting them multiple times a year; petitioner testified that "I've honestly lost track" of the number of times and that "[t]here are multiple e-mails that have been sent to staff, letters sent to our church directory, to neighbors of the church, to local businesses, to other churches and pastors in the community."

¶ 17    Petitioner identified a number of letters sent by respondent and testified that "[i]t creates anxiety. It's a distraction from the ministry of the day, and it's an ongoing uncertainty as to where this is leading." Petitioner further testified that he "felt threatened throughout the years with this issue." Petitioner identified a letter dated May 22, 2010, to the chief of the Park Ridge police, which contained a handwritten note on top from respondent stating: "[Petitioner], by now you should realize that I'm not walking away from this matter. I hope you realize your mistake and do the right thing. Signed [respondent]." Petitioner testified that he felt "[t]roubled" when he read that document, and was concerned about "[n]ot only my safety but our congregation's safety and my family's safety." Petitioner received another letter dated July 29, 2010, which was addressed to him and to the church board and "strongly urge[d]" a meeting with respondent, which left him with "[a] growing concern of what needs to be done to resolve it and ongoing concern that this is an unpredictable threatening

situation." Petitioner also testified that respondent had entered the church offices without permission several times and had also distributed fliers on the windshields of automobiles in the church parking lot.

¶ 18 Petitioner testified that he filed the petition for a stalking no contact order because "I feared for my safety, the safety of my family, and the safety of our congregation." Petitioner further testified that respondent's actions caused him emotional distress, as well as "[r]epeatedly" causing distress to his staff. Petitioner testified that respondent's actions also distressed his congregation and that "I have parents asking is it safe to bring their family to our church."

¶ 19 When it came time for respondent to cross-examine petitioner, respondent stated: "I agree with everything that he said. I don't disagree." Respondent asked petitioner why he did not listen to respondent's version of events with respect to his issues with his wife, and petitioner responded that he had met with respondent twice and had "listened to your story extensively." Petitioner admitted that he complimented respondent's wife for leaving him, testifying that "[i]f a parishioner approaches me and says that they feel unsafe, they're fearing their physical safety, I'm going to encourage them to get to a safe place." After petitioner's testimony, all of petitioner's exhibits were admitted into evidence, and petitioner rested.

¶ 20 Respondent testified on his own behalf concerning his wife leaving him and petitioner's refusal to suggest that she attend marital counseling. Respondent testified that he attempted to meet with the church board and the pastors but that church staff refused to allow him to do so. Respondent further testified that, at one point, one of petitioner's assistants told him to "[m]ove on, get another wife." Respondent testified that "[t]his kind of dialogue, this belongs in the gutter but not in the church. And then they told me to leave or they would call the police. This is disgraceful. In my mind, the devil was firmly in trench [*sic*] in South Park Church." On cross-examination, respondent admitted that he was the author of all of the documents submitted as exhibits by petitioner.

¶ 21 After the parties had testified, the court issued its findings, noting that "there's really not much at dispute here." The court found that petitioner testified "very credibly, very consistently" about the circumstances under which petitioner had come into contact with respondent, namely, through respondent's wife, who was a parishioner. The court found:

"[A]s the respondent has testified to very clearly and unequivocally, ever since his wife left him in 2006, he has held [petitioner] directly and solely responsible. And, as a result of [respondent's] belief that [petitioner] was responsible and as [respondent] testified to, he was responsible for the destruction of his life for the past ten years.

You testified that [petitioner] destroyed your family; destroyed your marriage of 40 years; and that, for 10 years, you've been without a wife, without a family, and the last 10 years have been sad and painful."

¶ 22 The court recounted the letters that respondent sent to petitioner, to the church, and even to other churches, noting:

"[A]ll of these documents bear your signature. And the respondent admits that he authored these letters and he did disseminate them. And the language in—really—basically all of the letters, *** [petitioner] testified that this letter created anxiety, caused him distraction from his ministry. And the most important thing he

said was that he was not sure—as far back as 2009, he was not sure where this was leading. It was clear that the letters continued. And they—if you look at the letters, they become longer, double-sided, and more lengthy.

RESPONDENT: Yes.

THE COURT: And ultimately continued until as recently as this summer.

There was also the incident in 2014 where you were uninvited and the church was under renovation so their security features were not the same and you came into the office looking for [petitioner]. [Petitioner] said he went into another room, and you were escorted out. It caused quite a scene. And that, again, he suffered emotional distress. He wasn't sure what was happening. He was concerned for his safety, for the safety of his family. He has daughters. He was concerned for their safety and for the safety of the members of his church.

He said that the summer of 2017, this summer, there was a document left on the church members' automobiles. It was in the parking lot. And in that letter, again, you talked about the same things, how [petitioner] was responsible for the destruction of the church, how he was a tool of the devil, and said critical things of him. He said, again, that that caused him emotional distress.

Sir, *** the problem here is that you believe—because you believe that [petitioner] is responsible for the destruction of your marriage, that you can send these letters, that you can disseminate this information, that you can engage in a course of conduct directed at [petitioner], because you think he's responsible, that you can engage in that. But the law is clear. The law says that you cannot do that. Because sending letters to someone since 2006, coming to his church on several occasions, writing a book about him, disseminating information, sending letters to other pastors—

RESPONDENT: Yes, that's true.

THE COURT: —saying that he's responsible for the destruction of your marriage is conduct which would cause a reasonable person to suffer emotional distress.

RESPONDENT: Mm-hmm.

THE COURT: And [petitioner] testified that he has suffered emotional distress since 2007 and continues to suffer emotional distress up until this very day because he has no idea where this is leading. And to hear you testify in court, sir, that you still believe that there's absolutely nothing wrong with what you did because you believe that he is in fact responsible for the destruction of your marriage is unacceptable. You cannot continue this.

I find that the petitioner has established, by a preponderance of the evidence, that the respondent has engaged in stalking; and there is a need for a plenary stalking/no contact order."

¶ 23    The trial court asked petitioner's counsel what specific remedies petitioner was seeking, and counsel responded:

"I am asking for him to refrain from coming within—and I want to make this easy on everybody—two blocks of the church. I want him to refrain from disseminating written materials about [petitioner] or the church. I want him to stop sending materials to the church or church members by any means whatsoever. And obviously

he can't come near [petitioner's] home, although that has not been a problem to date to my understanding."

¶ 24 On the same day, the trial court entered the stalking no contact order at issue on this appeal. Similar to the other orders, the October 3 order prohibited respondent from threatening to commit stalking or committing stalking; from having any contact with petitioner; from knowingly coming within, or knowingly remaining within, 500 feet of petitioner's residence or place of employment; and from possessing a firearm owner's identification card or possessing or buying firearms. In addition, in paragraph (b)(5), the order set forth the relief challenged on appeal:

> "The following other injunctive relief is ordered: Respondent is prohibited from communicating, publishing or communicating in any form any writing naming or regarding [petitioner], his family, or any employee, staff or member of the congregation of South Park Church in Park Ridge, IL."

The order provided that it would be in effect until October 3, 2019.

¶ 25 This appeal follows.

¶ 26                                    ANALYSIS

¶ 27 On appeal, respondent raises one issue: whether the portion of paragraph (b)(5) in which respondent is prohibited from communicating or publishing any writing regarding petitioner and the other parties specified in the order violates respondent's constitutional right to free speech. "Recognizing that '[s]talking is a serious crime,' the legislature passed the civil Act in 2010 to provide a remedy for victims who have safety fears or emotional distress as a result of stalking." *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 10 (quoting 740 ILCS 21/5 (West 2012)). " 'Stalking' " is defined under the Act to mean "engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2016). A " '[c]ourse of conduct' " is defined, in relevant part, as "2 or more acts, including but not limited to acts in which a respondent directly, indirectly, or through third parties, by any action, method, device, or means, *** threatens, or communicates to or about, a person, [or] engages in other contact." 740 ILCS 21/10 (West 2016). " 'Contact,' " in turn,

> "includes any contact with the victim, that is initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim." 740 ILCS 21/10 (West 2016).

"Stalking" expressly "does not include an exercise of the right to free speech or assembly that is otherwise lawful." 740 ILCS 21/10 (West 2016).

¶ 28 In the case at bar, respondent does not challenge the trial court's finding that he had engaged in stalking petitioner and does not appear to challenge the relief granted that was directed specifically at petitioner or his family. Instead, respondent challenges the broader

relief granted that prohibited him from any written communication or publication about South Park Church's employees, staff, or congregants. Under the Act, if a trial court finds a respondent has engaged in stalking, it may enter an order including one or more of the following types of relief:

> "(1) prohibit the respondent from threatening to commit or committing stalking;
>
> (2) order the respondent not to have any contact with the petitioner or a third person specifically named by the court;
>
> (3) prohibit the respondent from knowingly coming within, or knowingly remaining within a specified distance of the petitioner or the petitioner's residence, school, daycare, or place of employment, or any specified place frequented by the petitioner; ***
>
> (4) prohibit the respondent from possessing a Firearm Owners Identification Card, or possessing or buying firearms; and
>
> (5) order other injunctive relief the court determines to be necessary to protect the petitioner or third party specifically named by the court." 740 ILCS 21/80(b) (West 2016).

The relief challenged by respondent falls under the last category—"other injunctive relief the court determines to be necessary to protect the petitioner or third party specifically named by the court." 740 ILCS 21/80(b) (West 2016).

¶ 29    Respondent argues that the trial court's order represents a prior restraint on his speech in violation of his constitutional right to free speech. As an initial matter, petitioner claims that respondent has forfeited his right to assert this claim on appeal, since he did not raise it before the trial court. It is well established that issues not raised in the trial court are forfeited and may not be raised for the first time on appeal. *Susman v. North Star Trust Co.*, 2015 IL App (1st) 142789, ¶ 41. This applies even to constitutional questions, where "[t]he general rule in civil cases is that constitutional arguments which are not raised by objection at trial are considered waived for purposes of appeal." *Werner v. Botti, Marinaccio & DeSalvo*, 205 Ill. App. 3d 673, 677 (1990) (citing *In re Liquidations of Reserve Insurance Co.*, 122 Ill. 2d 555, 567-68 (1988)); see also *Sherman v. Indian Trails Public Library District*, 2012 IL App (1st) 112771, ¶ 21 (finding a challenge to the petitioners' "first amendment civil rights, including their right to free speech and to associate for political purposes" to be forfeited because they were raised for the first time on appeal). In the case at bar, respondent has failed to preserve this issue for review by raising it for the first time on appeal. However, "waiver and forfeiture rules serve as an admonition to the litigants rather than a limitation upon the jurisdiction of the reviewing court," and "courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33. While our supreme court has cautioned that this principle "is not and should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will" (*Jackson*, 2012 IL 111928, ¶ 33), in the case at bar, the issue has been fully briefed by the parties and concerns an important constitutional right; while not excusing respondent's failure to previously raise the issue, we also note that respondent was *pro se* during the hearing on the order. While a party's *pro se* status does not relieve him from complying with procedural rules, "[w]e believe there ought to be some consideration" for the fact that respondent was unrepresented by counsel. *Dombrowski v. City*

*of Chicago*, 363 Ill. App. 3d 420, 425 (2005). Accordingly, we choose to overlook respondent's technical forfeiture of this issue and proceed to consider the merits of his arguments on appeal.

¶ 30    We note that several courts have found that the Act itself does not violate a respondent's free speech rights, as the only speech that is prohibited by the Act are threats of violence or intimidation, "which are not constitutionally protected in any event." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 20; *McNally*, 2015 IL App (1st) 134048, ¶ 17. According to Webster's Third New International Dictionary, to intimidate means to *frighten*, among other things. Webster's Third New International Dictionary (1986). Although respondent called the church a "corrupt church" and its pastor "a tool of the devil" and stated "that this is *spiritual warfare* between GOOD and EVIL" (emphasis in original), there is nothing in the record of this case that shows that this conduct constituted a threat of violence. Although the pastor testified that respondent's conduct caused him to fear for his and his congregants' safety, there was no finding by the trial court that the written or spoken conduct of respondent constituted intimidation or that his written or spoken conduct constituted threats of violence. Respondent's written and spoken conduct was continuous for a long period of time and the written word was ultimately placed in a published book.

¶ 31    The trial court has made no finding that anything he said in his written words constitutes a threat of violence or that the words written illustrate intimidation or would put fear of violence in the mind of a reasonable person. Certainly, the conduct of respondent annoys and bothers the pastor and is not pleasant for the church. The trial court has restricted respondent from coming within 500 feet of the pastor, his residence, or the church, so respondent is basically restricted from using only the written word in his war against the pastor and the church.

¶ 32    "When words are a component of the stalking behavior, then the speech does not fall within constitutional protections." *Henby v. White*, 2016 IL App (5th) 140407, ¶ 26. Certain statements on social media postings concerning a stalking victim similarly have been found to fall outside the purview of protected speech. See *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 19 (finding that the respondent's social media postings "making degrading, threatening and harassing comments about" the victim was not speech protected by the first amendment). However, in the case at bar, the trial court made no findings that any of the writings authored by respondent were threats of violence or statements of intimidation.

¶ 33    We also note, however, that our supreme court has recently invalidated a portion of the criminal stalking statute on first amendment grounds and that the definition of stalking contained in the criminal statute is nearly identical to the definition contained in the Act at issue in the instant appeal. See *People v. Relerford*, 2017 IL 121094, ¶ 63 (finding "the portion of subsection (a) of the stalking statute that makes it criminal to negligently 'communicate[ ] to or about' a person, where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress, is facially unconstitutional"). We have no need to determine the impact of the supreme court's decision on the civil Act, however, since respondent does not challenge the constitutionality of the Act

itself but solely challenges the constitutionality of the injunctive relief the trial court awarded.[2]

¶ 34    In the case at bar, respondent argues that the court's order prohibiting him from any written communication or publication about South Park Church's employees, staff, or congregants represents a prior restraint that violates his right to free speech. "A prior restraint has been defined as a 'predetermined judicial prohibition restraining specified expression.' " *In re A Minor*, 127 Ill. 2d 247, 264 (1989) (quoting *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir. 1975)). "[A]ny prior restraint upon speech, while not unconstitutional *per se*, bears a heavy presumption against its validity." *In re A Minor*, 127 Ill. 2d at 265. In the case at bar, respondent relies on two Illinois Supreme Court cases concerning prior restraints, claiming that the prohibition entered by the trial court in the instant case was constitutionally impermissible. However, these two cases are entirely inapposite to the situation present in the case at bar. In both cases, the restrained speech at issue was a newspaper's disclosure of identities during a pending judicial proceeding. See *In re A Minor*, 127 Ill. 2d at 251 (prohibiting newspaper from disclosing name of juvenile charged in criminal proceeding); *In re A Minor*, 149 Ill. 2d 247, 248 (1992) (prohibiting newspaper from disclosing names of minor victims of physical and sexual abuse). Indeed, this type of prohibition is a common scenario in which the prior restraint issue occurs. See *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 56 (" 'In the context of a pending judicial proceeding,' *** a 'prior restraint' ordinarily refers to a court order (or statute) that limits the press's freedom to publish information about the proceeding."). Here, by contrast, the trial court's order did not concern prohibiting the publication of any information involving a pending court proceeding.

¶ 35    Nevertheless, respondent's argument that prior restraints such as those imposed by the trial court in the instant case are disfavored is well taken. Furthermore, our supreme court has noted that, generally, "[c]ontent-based laws, which target speech based on its communicative content, are presumed to be invalid." *Relerford*, 2017 IL 121094, ¶ 32. When they silence protected speech, as this one does, they must survive the rigors of strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015); *Relerford*, 2017 IL 121094, ¶ 32. Few content-based restrictions ever do. "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message conveyed." *People v. Minnis*, 2016 IL 119563, ¶ 32. Since the trial court's order in the instant case targeted respondent's speech based on its subject matter—the church or its members—it would be considered a content-based restriction and presumptively prohibited. An injunction that prohibits respondent from writing *anything* at all about his pastor or any other member of his church congregation—whether flattering or unflattering, fact or opinion, innocuous or significant, and regardless of the medium of communication—certainly would not be that rare case that survives strict scrutiny. It is all but impossible to imagine a factual record that would justify this blanket restriction on respondent's speech. Paragraph (b)(5) of the order is substantially and obviously overbroad, and it violates respondent's first-amendment right to free speech.

¶ 36    Our supreme court has noted that "the United States Supreme Court has recognized that certain 'historic and traditional' categories of expression do not fall within the protections of

---

[2]We note that the terms of the injunctive relief are not dictated by the language of the statute but were handwritten into the preprinted form order.

the first amendment, and content-based restrictions with regard to those recognized categories of speech have been upheld." *Relerford*, 2017 IL 121094, ¶ 33. These categories include (1) advocacy intended, and likely, to incite imminent lawless action; (2) obscenity; (3) defamation; (4) speech integral to criminal conduct; (5) " 'fighting words' "; (6) child pornography; (7) fraud; (8) "true threats"; and (9) speech presenting some grave and imminent threat the government has the power to prevent. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion).

¶ 37 For instance, defamatory statements concerning petitioner would not be protected. See, *e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Similarly, threats made by respondent against the church or its congregants clearly would not be protected speech. See, *e.g.*, *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (*per curiam*). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " *Black*, 538 U.S. at 359-60 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). In order to determine whether a threat is a "true threat," it is important to consider the context in which the threat was made, including the reaction of the listeners. See *Watts*, 394 U.S. at 708 (considering "the expressly conditional nature of the statement" and "the reaction of the listeners"). Generally, the question of whether a particular statement constitutes a "true threat" is for the finder of fact to decide. *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990). In the case at bar, the trial court made no such findings here. However, some courts have also applied an independent review of "constitutional facts," meaning that a reviewing court defers to the factfinder's findings on historical facts, credibility determinations, and elements of statutory liability but then conducts an independent review of the record " 'to determine whether the facts as found by the [factfinder] establish the core constitutional fact' of a true threat." *United States v. Turner*, 720 F.3d 411, 419 (2d Cir. 2013) (quoting *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002)). However, to enjoin respondent's speech before any of these remedies or categories listed is successfully invoked is the canonical example of a "previous" or prior restraint. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 719 (1931); see also *Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America*, 400 Ill. 38, 45-46 (1948) (injunction generally does not lie merely to prevent allegedly defamatory speech).

¶ 38 In the case at bar, respondent's writings directed at petitioner and his church demonstrated that he viewed himself as the recipient of "Divine Intervention" and had a "responsibility to use [his] accurate and supernatural information" to prove that "there is a God in heaven and a devil in hell." Respondent's writings also established that he viewed petitioner as "influenced by the devil" and as a "tool of the devil" and further established that he believed there was "spiritual warfare between good and evil" (emphases omitted) and that he was "compelled to fulfill [his] destiny which was predicted since [he] was a child." Respondent also included handwritten notes on several of his writings, telling petitioner on one: "By now you should realize that I am not walking away from this matter. I hope you

- 12 -

realize your mistake and do the right thing" and stating on another: "Do you realize that what you did was *9 years ago* and I still have not given up on what you did?" (Emphasis in original.) Petitioner testified that these communications had occurred for 10 years and were increasing in frequency and that, when he received these communications, he feared for his safety and for the safety of his congregants. While the language used by respondent may not have been an explicit threat to harm petitioner, the context of respondent's communications shows the passage of a long period of time since the perceived slight; an escalation in the communications; references to "spiritual warfare between good and evil" (emphases omitted), where respondent was identifying himself as "good" and petitioner as "evil"; respondent's belief that he was "compelled to fulfill" his prophesied "destiny"; and the fact that petitioner—the listener—had a reaction of fear for his safety and for the safety of his congregants. Moreover, "speech or writing used as an integral part of conduct in violation of a valid criminal statute" is not constitutionally protected. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). " 'Where speech is an integral part of unlawful conduct, it has no constitutional protection.' " *McNally*, 2015 IL App (1st) 134048, ¶ 17 (quoting *People v. Bailey*, 167 Ill. 2d 210, 227 (1995)).

¶ 39    To fit within this narrow exception, this prohibited speech must be in furtherance of a *separate* crime—a crime *other than* the speech itself and one that the constitution allows the legislature to punish. *Relerford*, 2017 IL 121094, ¶¶ 44-45; see *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249-50 (2002) (speech must have a "proximate link" to other criminal conduct). An example would be a ban on advertising child pornography. The advertising itself is speech, but it is an "integral part" of the act of child pornography, a separate crime that may be validly prohibited, and because of that proximate link between the advertising speech and the separate crime, that speech may be prohibited, as well. *New York v. Ferber*, 458 U.S. 747, 761 (1982); see also *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990); *United States v. Stevens*, 559 U.S. 460, 471 (2010). Here, the prohibited speech must be an integral part of the unlawful stalking in order to be unprotected. However, in this case, the trial court did not expressly find that respondent's comments rose to the level of posing a "true threat" to the physical safety of petitioner and his congregants. But without this link between the unprotected speech and a separate crime, the exception would swallow the first amendment whole: it would give the legislature free rein to criminalize protected speech, then permit the courts to find that speech unprotected simply *because* the legislature criminalized it. Our supreme court rejected exactly this misuse of the exception in *Relerford*, 2017 IL 121094, ¶¶ 41-45, when the court found that the exception does not permit the legislature (or a court) to prohibit speech simply because it is distressing.

¶ 40    In the case at bar, the trial court did not make any express findings that some of the conduct prohibited by the court's order would fall under this exception. The trial court found that respondent had engaged in stalking, which, under the Act, means "engaging in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2016). As noted, a "course of conduct" means two or more acts in which the respondent, either directly or indirectly, "follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other contact, or interferes with or damages a person's property or pet." 740 ILCS 21/10 (West 2016). "Contact" is further defined as including

"any contact with the victim, that is initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim." 740 ILCS 21/10 (West 2016).

¶ 41    At a minimum, the trial court's findings concerning respondent's stalking behavior included findings that respondent had repeatedly visited the church and its offices, that respondent had mailed letters to petitioner, that respondent had distributed letters to the members of the church, and that respondent had physically placed letters onto the automobiles of church members in the church's parking lot. The court found that respondent had persisted in these actions after being asked to cease all contact with petitioner and the church and that he had no intention of ceasing his conduct. Accordingly, there was ample evidence in the record that respondent had engaged in stalking behavior, and respondent does not challenge those findings on appeal. Speech that includes threats of violence or intimidation that is connected to such unlawful behavior would not be constitutionally protected if it occurs in the future.

¶ 42    Nevertheless, there remains much conduct that is prohibited under the trial court's order that would be considered constitutionally protected. For instance, a letter to the editor that was published in the local newspaper would be prohibited under the order, yet it would be constitutionally protected. The trial court may *not* enjoin respondent from criticizing petitioner or his church, even though petitioner finds that criticism distressing. That criticism, circulated in respondent's leaflets, books, and other written media, is the principal target of the speech injunction in paragraph (b)(5) of the order. Respondent's speech, however, is protected by the first amendment, and any written criticism by respondent would be constitutionally protected. Respondent's speech does not *lose* its protected status simply because it is distressing to petitioner. As *Relerford* emphasized, distressing speech is ubiquitous and unavoidable, both in everyday social interactions and when we are debating the topics of public concern at the core of the first amendment's protections. *Relerford*, 2017 IL 121094, ¶¶ 52-53. A business owner, for example, may well be distressed by speech criticizing his environmental practices, fearing that the speech could lead to a financially devastating boycott. *Relerford*, 2017 IL 121094, ¶ 53. However, that does not permit the legislature or a court to silence his critics. Respondent has every right to criticize petitioner's ministry and his church more broadly. He has every right to argue that they have betrayed their commitments to marriage and family that the Christian faith requires of them. Respondent has every right to voice his opinion that his marriage would have survived if those commitments had been in place to support the marriage.

¶ 43    While the Act itself contains an exemption providing that "[s]talking does not include an exercise of the right to free speech or assembly that is otherwise lawful" (740 ILCS 21/10 (West 2016)), the injunctive relief drafted by the trial court does not make clear that it applies only to otherwise unprotected speech, and by its broad terms, it would therefore prohibit constitutionally protected speech. Such content-based regulation "will be upheld only if necessary to serve a compelling governmental interest and narrowly drawn to achieve that

end." *People v. Jones*, 188 Ill. 2d 352, 358 (1999). In the case at bar, as noted, the injunctive relief awarded by the trial court was broadly drafted to cover situations that would encompass constitutionally protected speech without any obvious rationale or factual basis for its scope. We therefore vacate that portion of the trial court's order in paragraph (b)(5) that states: "Respondent is prohibited from communicating, publishing or communicating in any form any writing naming or regarding [petitioner], his family, or any employee, staff or member of the congregation of South Park Church in Park Ridge, IL."

¶ 44    Respondent's proselytizing has no doubt distressed petitioner. Petitioner alleged in his petition that it has "raise[d] questions" among some of the letters' recipients about his own "credibility" and that of the church and that responding to their concerns has been, in his view, "an unwanted distraction and excessive waste of time." However, we cannot silence respondent when he is voicing protected criticism, no matter how much time, energy, or distress it costs petitioner. Even less can we silence respondent on the ground that his criticisms of petitioner may have gained some traction—as if we can shield petitioner from the need to answer allegations that, in the minds of some individuals, really do demand answers. That is viewpoint discrimination. See *McCullen v. Coakley*, 573 U.S. ___, ___, 134 S. Ct. 2518, 2532-33 (2014) (speech prohibition that "favors one side in [a] *** debate" is viewpoint discrimination, "an egregious form of content discrimination" (internal quotation marks omitted)).

¶ 45                                         CONCLUSION

¶ 46    For the reasons set forth above, we find that the injunctive relief awarded by the trial court in its stalking no contact order infringed on respondent's free speech rights, because it encompassed constitutionally protected speech and was overly broad without any proper rationale or factual basis for its scope. Accordingly, we vacate paragraph (b)(5) of the order.

¶ 47    Vacated in part.

- 15 -