2020 IL App (1st) 201035-U

FIFTH DIVISION
October 26, 2020

No. 1-20-1035

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF ERIKA BUSH, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 2017 D 230075 |
| EDWIN F. BUSH, | ) ) | |
| Respondent-Appellant. | ) ) | Honorable John T. Carr, Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1   ***Held:***   The circuit court did not err by: (1) denying a "motion for recusal", (2) denying a motion to strike which sought to invalidate the order of protection statute as unconstitutional, or (3) in entering an emergency order of protection against respondent. We dismiss the remainder of the appeal for lack of an appropriate supporting record.

¶ 2   In February 2017, Erika Bush filed a petition for dissolution of her marriage to Edwin Bush. Since then, the case has been on the docket of three circuit court judges, the parties' two children have had two court-appointed representatives, the court has ordered the parties to see

several therapists, and Edwin has filed multiple appeals to this court. As described in our ruling on the last appeal, the case eventually went to trial and, before any evidence could be presented, Edwin stormed out and did not return. *In re Marriage of Bush*, 2019 IL App (1st) 191467-U, ¶ 24. The trial proceeded in his absence and the court entered an order dissolving the marriage and granting Erika "all sole decision-making authority for the minor children" and "suspending" Edwin's parenting time. *Id.* ¶ 31. We held that the circuit court had impermissibly reserved the issue of Edwin's parenting time, and reaffirmed that the circuit court may not restrict Edwin's parenting time without a written finding that his "exercise of parenting time would seriously endanger the [children's] physical, mental, moral, or emotional health." *Id.* ¶¶ 80-83 (quoting *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 33). We used our authority under Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) to leave subsection 9(C) of the judgment in place as a temporary order and remanded the case for further proceedings on the issue of Edwin's parenting time. *Id.* ¶ 85.

¶ 3 Although the parenting time issue was still unresolved, Erika filed a petition for an emergency order of protection against Edwin and on behalf of herself and the children. Erika alleged that Edwin had caused a disturbance at the children's school and had come to Erika's home and left disparaging written signs. The petition sought nearly every available relief, including that Edwin's parenting time be restricted to supervised visitation and that Edwin be enjoined from visiting the children's school.

¶ 4 In response to the petition, Edwin filed a barrage of pleadings which he piggy-backed onto the hearing date set on Erika's petition around midnight, just hours before the petition was to be heard. These included, among other things, a "motion to recuse" Judge Carr and two motions seeking temporary restraining orders, declaratory orders, and other relief. One motion argued that

that portions of the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101, *et seq.* (West 2018)) were unconstitutional because they permitted the court to restrict parenting time based on a lower standard than that required by the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/101, *et seq.*) (West 2018)). The other motion challenged the constitutionality of a circuit court administrative order prohibiting the recording of remote proceedings.

¶ 5     During the COVID-19 pandemic, the circuit court held a hearing on the petition via video conferencing software. A transcript of the hearing is in the record before us. At the hearing, Edwin presented and argued his "motion for recusal", contending that Judge Carr had made several rulings over the past two years that were not only wrong, but required Judge Carr to recuse himself. The court summarily denied the motion and proceeded with the hearing on the order of protection. Edwin's other motions were not discussed at any length. Edwin asserted that he had a pending motion to strike the petition, which the court then denied. Edwin later asserted that he had a pending motion directed against the administrative order against recording, but the court simply directed Edwin to proceed with his defense to Erika's order of protection petition.

¶ 6     Steve Wasko, the children's guardian *ad litem* (GAL), testified that on September 23, 2020, he had a discussion with the principal of the children's school regarding a recent incident. Edwin had evidently visited the campus, intending to see his son. Wasko testified that he had reviewed police reports and correspondence stemming from the incident but had not interviewed the parties or the children. He also testified that he had been notified of complaints by Erika that Edwin had come to her building in mid-August, but he did not investigate those claims because they did not relate to conduct witnessed by the children.

¶ 7    Wasko testified that Edwin had not had parenting time in nearly two years and opined that such a prolonged separation was "absolutely not" in the best interests of the children. He testified that the lack of a parenting schedule is "a great disservice to" the children, but he opined that until there was a parenting schedule in place, it was in the best interest of the children that Edwin stay away from the school.

¶ 8    Erika then testified that she picked up her children from school earlier than usual on September 23, 2020 because the principal had called to tell her that Edwin had been on the campus. She testified, over Edwin's hearsay objection, that their son told her that he saw Edwin at the school and that he told his teacher that he was afraid of Edwin. She testified that the children's enrollment in the school has been jeopardized by Edwin's behavior.

¶ 9    Erika also testified that, on August 15, she received a call from the callbox in the lobby of her building. On the other end of the line was Edwin, shouting that he wanted to see his children. She promptly hung up the phone. She testified that Edwin called "at least three more times" but she did not answer because she was frightened for her safety and that of the children. On cross-examination, she admitted that her petition only alleged that Edwin called twice.

¶ 10    Erika testified that a few days later, she found a large sign lying in her assigned parking spot. The sign accused Erika of child abuse, accused the circuit court and the local police of condoning the abuse, and concluded with a message to the children: "Daddy loves you." Erika testified that her assigned parking spot is in a secure parking garage under her building. She testified that her son read the sign and was upset. She later found a similar sign in front of the lobby of her building. She testified that she called the Park Ridge Police Department; officers came to her home and made a report. Neither of the signs were entered into evidence. When Erika held a picture of one of the signs up to the camera, the court said, "Put that down. I turn my head away."

On cross-examination, she admitted that she had no evidence that Edwin had personally entered the parking garage and placed the sign in her spot.

¶ 11 She then testified that in March, Edwin went on a profanity-laced tirade directed at her and her mother in the lobby of the court-ordered therapist's office. This outburst scared the children and precipitated the therapist discontinuing reunification therapy. After she testified, Erika rested.

¶ 12 Edwin then spoke on his own behalf in a free-form manner which blended testimony and argument. He admitted that he made the two signs Erika described. He testified that he placed them in front of her lobby and "on the entry way to her garage", but he denied that he placed one in her parking spot. He also admitted that he had, in fact, gone to Erika's building and called her three times from the callbox, but he denied that he ever raised his voice. After she hung up on him, he started recording with his cellular telephone and called again, but Erika did not answer. Edwin then went to his girlfriend's house and inadvertently recorded a conversation with her. Edwin attempted to present that recording, but the court would not allow it.

¶ 13 Edwin then testified about the altercation at the therapist's office. He testified that he called Erika's mother an "old hack" and told them both that they should be ashamed of themselves. He denied swearing at them and denied that the therapist's decision to discontinue therapy had anything to do with the alleged outburst. Rather, he contended, the therapist discontinued therapy because Erika made it very difficult to schedule appointments.

¶ 14 Finally, Edwin testified that he had visited his children's school on the September 23 because he happened to drive past it on the way to court to file some paperwork. He testified that he walked past the recess area, asked an employee whether his son's class was at recess, and learned that they were not. He then went into the building, signed the guest registry, and told an employee that he was there to see his son. He then spoke with the school principal, who asked to

see some papers—meaning a court order—before she would let him see his son. He asserted that no court order prohibited him from visiting his children at school. The principal called Erika, who evidently told her that Edwin was prohibited from seeing the children. He became frustrated with the principal and began to argue with her. After the principal called the police, Edwin had a conversation with two officers. He explained his position and was not arrested or even escorted off the property. Edwin testified that his son was never in the office area and that he had not been in the recess area, so there was no way that his son could have seen him that day.

¶ 15 Edwin attempted to call Dr. James Bedell as an expert witness. However, when the circuit court determined that Dr. Bedell was not an eyewitness to any of the incidents at issue, it excused him as a witness. Edwin then called Erika as a witness, but after the circuit court sustained several objections as to the relevance of questions about past allegations she had made against him, he rested.

¶ 16 Erika's counsel argued in closing that, since Edwin admitted all the relevant allegations, the court should enter an order of protection "until we're able to go to hearing on parenting time or in the alternative to grant Mr. Bush supervised visits." Edwin argued that Erika's testimony was not credible and that his actions in placing the signs was constitutionally protected speech. He also argued that, without a parenting schedule in place, he had a right to go to his children's school.

¶ 17 From the bench, the circuit court ruled that the emergency order of protection would be granted. The court specifically found that Edwin's admitted placement of the signs at Erika's building constituted harassment as defined in the Domestic Violence Act. The court entered a written emergency order of protection that did not address any of Edwin's motions. This appeal follows.

¶ 18    Erika has not filed an appearance in this court, nor has she filed a brief. Consequently, we review this case on Edwin's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131 (1976) (reviewing courts may address the merits of a case on one party's brief only "if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief").

¶ 19    This court has an independent duty to consider its jurisdiction. *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984). Edwin filed this appeal pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017), which governs orders granting or denying temporary restraining orders. His notice of appeal lists four orders to be reviewed: two denying Edwin's motions for temporary restraining orders, one denying his "motion for recusal", and one granting Erika's petition for an emergency order of protection. However, the only written order entered by the court on the date in question was the emergency order of protection. Edwin has presented unsigned draft orders denying his motions, but because they are unsigned, they are ineffective and of no value in this appeal. Consequently, our jurisdiction extends only to the review of the emergency order of protection and any steps in the procedural progression leading to it. Although this appeal was originally docketed as an appeal from a temporary restraining order, we ordered that this appeal proceed under Rule 307(a)(1), which governs appeals from orders granting injunctions. See Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017).

¶ 20    First, Edwin asks that we review the denial of his "motion for recusal", which was a step in the procedural progression leading to the entry of the emergency order of protection. That motion was premised upon Illinois Supreme Court Rules 62 (eff. Oct. 15, 1993) and 63 (eff. Feb. 2, 2017). The motion alleged that the court was biased against Edwin and cited several adverse rulings that allegedly serve as the bases for a federal lawsuit by Edwin against Judge Carr.

¶ 21    Rule 63 states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where *** the judge has a personal bias or prejudice concerning a party." Ill. S. Ct. R. 63(C)(1)(a) (eff. Feb. 2, 2017). "Whether a judge should recuse himself is a decision in Illinois that rests *exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code." (Emphasis in original.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. "The Judicial Code, which is a part of our rules, says nothing that would give the impression that its provisions could be used by a party or his lawyer as a means to force a judge to recuse himself, once the judge does not do so on his own." *Id.* The proper method for seeking substitution of a judge in a civil case is governed exclusively by statute. *Id.* ¶ 26.

¶ 22    Section 2-1001 of the Code of Civil Procedure allows a litigant to petition for a substitution of judge for cause. 735 ILCS 5/2-1001(a)(3)(ii) (West 2016). Edwin has filed at least three such petitions, which were heard and denied by other judges. *In re Marriage of Bush*, 2019 IL App (1st) 191467-U, ¶ 87. His motion to force Judge Carr's recusal based on Rule 63 was an inappropriate attempt to circumvent those orders. Moreover, the only obvious difference between his petitions for substitution and the motion to recuse is that the motion to recuse also lists Edwin's threatened federal lawsuit against Judge Carr as a source of bias. But the threat or existence of a separate lawsuit against the judge cannot serve as the basis for substitution. *Gillard v. Northwestern Memorial Hospital*, 2019 IL App (1st) 182348, ¶ 57. "To allow such a tactic would thwart the administration of justice and encourage the filing of frivolous lawsuits against judges." *Id.* We will not, therefore, disturb the circuit court's decision on the motion to recuse.

¶ 23    Next, Edwin argues that the circuit court erred in even hearing Erika's petition. He contends, as he did in his motion to strike the petition, that the Domestic Violence Act is facially

8

unconstitutional because it is at odds with the IMDMA. This argument also presents an issue which was in the procedural progression to the emergency order of protection. We begin by rejecting Edwin's premise that a conflict between two statutes renders one unconstitutional. "Where there is an alleged conflict between two statutes, a court has a duty to interpret those statutes in a manner that avoids an inconsistency and gives effect to both statutes, where such an interpretation is reasonably possible." *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311-12 (2001), citing *McNamee v. Federated Equipment & Supply Co.*, 181 Ill.2d 415, 427. Failing that, a court employs canons of legislative construction to determine which law should control. *Moore v. Green*, 219 Ill. 2d 470, 479, (2006).

¶ 24    The Domestic Violence Act requires a court to "restrict or deny respondent's parenting time with a minor child if the court finds that respondent has done *or is likely to* *** act in a manner that is not in the *best interests* of the minor child". (Emphasis added.) 750 ILCS 60/214(b)(7) (West 2018). However, IMDMA allows the court to restrict parenting time only after finding "that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development". 750 ILCS 5/603.10 (West 2018). Edwin argues that these two standards are incompatible, and that the Domestic Violence Act's less restrictive "best interests" standard must yield to the IMDMA's "seriously endangered" standard. This argument completely ignores the fact that the Domestic Violence Act specifically states that "[t]he court shall not be limited by the standards set forth in" the IMDMA. In many respects the Domestic Violence Act and the IMDMA reflect the public policy of the State, and the judiciary must defer to the legislature where the legislature has declared the public policy of the State. See *Roanoke Agency, Inc. v. Edgar*, 101 Ill. 2d 315, 327 (1984).

¶ 25    That brings us to the emergency order of protection. An injunction is "a 'judicial process operating *in personam* and requiring [a] person to whom it is directed to do or refrain from doing a particular thing.' " *In re A Minor*, 127 Ill. 2d 247, 261 (1989) (quoting Black's Law Dictionary 705 (5th ed.1979)). "An order of protection is an injunctive order because it directs a person to refrain from doing something, such as to refrain from entering or residing where he or she lived before the order was entered." *In re Marriage of Fischer*, 228 Ill. App. 3d 482, 486-87 (1992). "[T]he standard of review in an interlocutory appeal generally is whether the trial court abused its discretion in granting or denying the requested relief." *Bishop v. We Care Hair Development Corp.*, 316 Ill. App. 3d 1182, 1189 (2000).

¶ 26    The circuit court did not abuse its discretion in entering the emergency order of protection. Both Erika and Edwin testified about their interaction at the therapist's office, the calls from the lobby callbox, the placement of the signs, and the argument between Edwin and the school principal. Although they differed in their interpretation of those events, it was the purview of the circuit court to weigh the witnesses' respective credibility and resolve any inconsistencies. See *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23 ("the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive.") The circuit court, therefore, could have credited Erika's accounts of the incidents. Edwin argues—without citation to authority—that the signs ought to have been entered into evidence. But he admitted to making and placing them, so the existence of the signs and their basic contents were not in dispute.

¶ 27    Given Edwin's admissions, the court could reasonably have concluded that Edwin's actions constituted harassment within the meaning of the Domestic Violence Act. " 'Harassment' means knowing conduct which is not necessary to accomplish a purpose that is reasonable under

the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2018). Edwin argues that his placement of signs at Erika's building was "reasonable under the circumstances" because it was part of an effort to have the police perform a "wellbeing check" on his children. However, that argument was not raised in the hearing. "Issues raised for the first time on appeal are waived." *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 161 (1999). Moreover, a reasonable factfinder could have concluded that shouting at Erika through her building's callbox and placing signs around her building was an *unreasonable* way to request that the police perform a wellbeing check.

¶ 28    Edwin also argues that placing the signs constituted protected speech, relying on *Flood v. Wilk*, 2019 IL App (1st) 172792. In that case, the court vacated part a stalking no contact order that impermissibly infringed on the respondent's free speech rights. *Id.* ¶ 46. However, that case offers no support for Edwin's position. For one thing, the *Flood* court did not reverse the trial court outright; it simply vacated a narrow provision of the trial court's order. Edwin does not identify any such provision that we should vacate in this case. Moreover, in that case, the court reaffirmed the principle that when words are part of a pattern of stalking or harassing behavior, they do not constitute protected speech. *Id.* ¶ 32 (citing *Henby v. White*, 2016 IL App (5th) 140407, ¶ 26 and *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 19). Even assuming that the words on the signs would otherwise be protected speech, the circuit court found that the placement of the signs was part of Edwin's harassing behavior, so Edwin cannot hide behind the First Amendment.

¶ 29    Additionally, the Domestic Violence Act includes a presumption that "creating a disturbance at petitioner's *** school" causes emotional distress. 750 ILCS 60/103(7)(i) (West 2018). There is no genuine dispute that there was a "disturbance" at the children's school. Edwin

11

admitted to getting into a heated argument with the principal and that the police were called as a result. However, he argues that the only evidence that his son saw him at the school or saw the offending signs was hearsay testimony from Erika. Edwin acknowledges that out-of-court statements by children may be allowed in court under certain circumstances. See, *e.g.*, 750 ILCS 5/606.5(c) (West 2018) and 735 ILCS 5/8-2601 (West 2018). He argues, however, that the GAL should be the source for any out-of-court statements by the children, given the GAL's role as "eyes and ears of the court". See *In re Mark W.*, 228 Ill. 2d 365, 374. However, Edwin presents no statute or case law for the notion that out-of-court statements by the children are *only* admissible through the GAL. In sum, the evidence presented was sufficient to support the entry of an emergency order of protection.

¶ 30    Edwin further argues that Erika misused the Domestic Violence Act in an effort to obtain an order she could not have gotten under the IMDMA. For this proposition, he cites *In re Marriage of Gordon*, 233 Ill. App. 3d 617 (1992). In that case, this court found that a petitioner had used a filing under the Domestic Violence Act as a "subterfuge" to avoid the requirements of the IMDMA. *Id.* at 627. In that case, the court held that the true gravamen of the petitioner's allegations all had to do with custody. *Id.* at 626. In this case, however, several of the allegations relate to Edwin's harassment of Erika. *Gordon* is therefore distinguishable, and we do not find that Erika's use of the Domestic Violence Act was the sort of "subterfuge" that requires reversal.

¶ 31    Edwin's final argument directed toward the emergency order of protection is that the circuit court never made a specific finding that he had acted or was likely to act in a manner that was not in the best interests of the children. However, the circuit court did specifically find that his actions constituted harassment under the Domestic Violence Act, that his son witnessed the harassing behavior, and that his son suffered emotional distress as a result. Clearly, suffering emotional

distress because of his father's actions is not in the child's best interest. For all these reasons, the court did not abuse its discretion in granting the emergency order of protection.

¶ 32    Edwin also asks that we review the denial of his motion directed against the circuit court's administrative order. There does not appear to be any ruling—written or otherwise—on that motion. Moreover, such a ruling would not constitute a step in the procedural progression leading to the entry of the order of protection, as whether proceedings at the circuit court can be recorded in no way bears on the court's ruling on Erika's petition. We therefore do not have jurisdiction over any such ruling, and we offer no opinion on the validity of the administrative order.

¶ 33    Edwin has filed a motion before this court requesting an order of contempt and sanctions against Erika, her counsel, Judge Carr, the Presiding Judge of the Domestic Relations Division of the Circuit Court of Cook County, and "the entire Cook County Domestic Relations Division". We entered an order taking that motion with the case. The gist of the motion is that nearly everyone involved in this case at the circuit court level has willfully disobeyed the mandate from the last appeal. As a result, Edwin argues, nearly a year has passed without the circuit court hearing and ruling on the issue of his parenting time. See *Bush*, 2019 IL App (1st) 191467-U, ¶ 96 ("We remand this case for further proceedings and entry of final judgment on the issue of Edwin's parenting time").

¶ 34    As discussed above, our jurisdiction in this appeal extends only review of the circuit court's emergency order of protection and the procedural steps leading to that order. The mandate from appeal no. 1-19-1467 is not a part of this appeal. Moreover, even if Edwin had filed his motion under the 1-19-1467 appeal, it would be ineffective because this court's jurisdiction in that appeal ended with the issue of the mandate. See *Illinois State Chamber of Commerce* v. *Pollution Control Board.*, 67 Ill. App. 3d 839, 843 (1978) ("(A) reviewing court in Illinois is divested of jurisdiction

in a cause before it when its mandate issues to a lower court"). Consequently, we deny Edwin's motion for contempt.

¶ 35    Finally, in our order disposing of the last appeal, "we strongly admonish[ed] Edwin to comport his conduct *** to the standards of civility required not only of litigants in general, but especially of lawyers." *Bush*, 2019 IL App (1st) 191467-U, ¶ 96. The situation has not improved. In his brief in this case, Edwin, who is a licensed attorney representing himself in the matter, "admit[s] that [his] communications are disparaging", which is something of an understatement. The circuit court has characterized Edwin's behavior as "obstreperous[,] *** mean and nasty". Those characterizations are supported by the record. For example, in one email, Edwin referred to opposing counselors as a "fat ass" and a "suborning perjury piece of s***". The email was addressed to opposing counsel and was copied to the GAL, Judge Carr, and Judge Carr's case coordinator and later filed with this court by Edwin. He concluded the email with the statement, "You are all child abusing filth, all of you. Bring it. When the justice system fails, I will have my recourse." The hearing on the order of protection is replete with examples of Edwin making other angry and uncivil statements. For example, Edwin stated to Judge Carr: "Ha, you're a clown that's why this is the clown car. You're a clown." and "You have no business in public office. Absolutely none." We direct the clerk of this court to transmit a copy of this order to the Attorney Registration and Disciplinary Commission (ARDC) for its information with respect to the actions of Edwin Bush. See *Cushing v. Greyhound Lines, Inc.*, 2013 IL App (1st) 103197, ¶ 380 (directing "the clerk of the appellate court to send a copy of [the] opinion to the [ARDC] in order to allow the ARDC to further consider the actions of the attorneys").

¶ 36    We affirm the order granting an emergency order of protection and the two orders in the procedural progression to that order over which we have jurisdiction: the oral order denying the

motion to recuse, and the oral order denying the motion to strike. We dismiss the portion of the appeal purporting to seek review of orders denying Edwin's motions for temporary restraining orders on the basis that the record before us contains no such orders and it appears that the circuit court never entered any such orders. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 37    Affirmed in part and dismissed in part; motion denied.