# Illinois Official Reports

## Appellate Court

---

### *Same Condition, LLC v. Codal, Inc.*, 2021 IL App (1st) 201187

---

| | |
|---|---|
| Appellate Court Caption | SAME CONDITION, LLC, an Illinois Limited Liability Company, Plaintiff and Counterdefendant-Appellant, v. CODAL, INC., an Illinois Corporation, Defendant and Counterplaintiff-Appellee (Munish Kumar, a/k/a Munish Kumar Raizada, Counterdefendant-Appellant). |
| District & No. | First District, Third Division<br>No. 1-20-1187 |
| Filed | June 21, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-L-5407; the Hon. Diane M. Shelley, Judge, presiding. |
| Judgment | Order vacated. |
| Counsel on Appeal | Munish Kumar, of Chicago, appellant *pro se*.<br><br>Bryan Sugar, William Mauke, and Siobhán M. Murphy, of Lewis Brisbois Bisgaard & Smith LLP, of Chicago, for appellee. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a business relationship between Codal, Inc. (Codal), and Same Condition, LLC (Same Condition), soured, Same Condition sued Codal for breach of contract, among other claims. Codal then countersued Same Condition and its president, Munish Kumar, raising various claims, including ones sounding in defamation based on critical comments and reviews that Same Condition and Kumar had posted online. As the litigation progressed, Same Condition and Kumar continued posting critical comments and reviews online about Codal and its chief executive officer, Keval Baxi, which resulted in Codal filing motions for a preliminary injunction and temporary restraining order to have Same Condition and Kumar cease their online campaign. Although the circuit court denied those motions, it utilized its inherent authority to manage its cases and prohibited Same Condition and Kumar from making any additional posts online about Codal.

¶ 2    Same Condition and Kumar have appealed the circuit court's order as an unconstitutional abridgment on their right to free speech under both the first amendment of the United States Constitution (U.S. Const., amend. I) and article I, section 4, of the Illinois Constitution (Ill. Const. 1970, art. I, § 4). Because we agree that the court's order is unconstitutional, we vacate that order.

## I. BACKGROUND

¶ 3

¶ 4    Codal is a corporation that provides personnel with expertise in the fields of systems integration, information technology consulting, and systems development. Same Condition is a company that intended on creating a web-based, medical patient-centered software application. In June 2017, Same Condition hired Codal to develop that software application. According to Same Condition's interpretation of their agreement, Codal was supposed to deliver the software application to it by January 2018. But, by January 2018, Codal had failed to deliver the application. And, in July 2018, when Codal had delivered the software application, Same Condition believed the application was incomplete, substandard, rife with errors and bugs, and inadequate to be released publicly. According to Same Condition, by October 2018, Codal indicated that it needed at most 100 more hours of work to complete the application to Same Condition's specifications.

¶ 5    Eventually, in May 2019, after the software application allegedly did not meet Same Condition's standards, it sued Codal for breach of contract, fraud, and unjust enrichment. Two months later, Codal answered Same Condition's complaint and denied the chief allegations therein. Codal also raised several affirmative defenses and brought counterclaims, including breach of contract for Same Condition's failure to pay an invoice of $30,750.

¶ 6    In August 2019, Codal, with leave from the circuit court, filed its first amended counterclaims. Codal added claims for defamation *per se*, defamation *per quod*, a violation of the Uniform Deceptive Trade Practices Act (Deceptive Practices Act) (815 ILCS 510/1 *et seq.* (West 2018)) and commercial disparagement against Same Condition and Kumar, Same Condition's president. All four counterclaims were based on online posts from Kumar and Same Condition about Codal's performance and business integrity. Codal attached these posts as exhibits to its first amended counterclaims.

¶ 7        One exhibit showed a comment on a post from Codal's LinkedIn page, where Kumar stated that he hired Codal to build an "ambitious" software platform and "gave them a huge sum" but the project was not completed on time and the platform that was completed was defective. Kumar added that he had to hire a third-party quality assurance tester to test Codal's platform and remarked that it was:

> "more than clear that Codal lacks the technical expertise to build the software or our specifications. It was not a small platform (technically, but then we hired Codal because they assured that have the required skill sets to accomplish the kind of work it requires. And they asked is premium cost, which we kept paying as bills kept coming). But Codal has not been able to hand over the platform to us now. Harassed and frustrated by Codal's highly unethical business practices, we had to drag them to court in Chicago in 2019."

¶ 8        Another exhibit showed that, in July 2019, Same Condition's Twitter account replied to various tweets from Codal's Twitter account. In some of these replies, Same Condition remarked that Codal had "cheated" the company, delivered a "half-cooked buggy platform," provided a "nightmare experience," and overall exhibited "[v]ery unethical business practices." In addition to Codal being tagged in the replies, other companies' Twitter accounts were as well. Additional exhibits showed that, in July 2019, Kumar left similarly negative reviews on Codal's Google page, its Better Business Bureau page, and its Clutch page.

¶ 9        Same Condition and Kumar subsequently filed their own answer and affirmative defenses to Codal's counterclaims. In that filing, Same Condition and Kumar admitted that the referenced social media posts had been posted by them, but they denied that any of the posts contained false statements. As the litigation proceeded from 2019 to 2020, the parties conducted discovery.

¶ 10       In February 2020, Same Condition and Kumar filed a motion for an extension of time to answer Codal's requests to admit. The next month, Codal filed a response opposing their motion for an extension of time and to expedite the circuit court's ruling on the motion. In Codal's response, it observed that Same Condition and Kumar had "embarked on an extensive campaign of posting new defamatory content on social media." Codal highlighted that Same Condition changed its Twitter biography to state that it was "[a] Global Health Community that failed to start because @GoCodal messed up our software product. Seeking justice from Chicago-based #Codal and its CEO @kevalbaxi." Additionally, Codal asserted that Same Condition and Kumar had contacted Codal's former clients, potential clients, past employees, and current employees in order to defame Codal and Baxi, its chief executive officer. Codal attached to its response a declaration from Baxi, who averred to the various actions allegedly taken by Same Condition and Kumar. Baxi pointed out that Same Condition and Kumar's social media campaign included them "making negative and disparaging comments on all of Codal's online postings." Baxi noted that Codal's "online presence [was] critical" to its business and asserted that Same Condition and Kumar's "actions have prevented Codal and [him]self from maintaining said online presence as we are unable to issue necessary press release, important marketing materials, or post even unrelated social media content as [Same Condition and Kumar] respond to any online post with negative and defaming comments." Baxi further highlighted a chronological list of the social media posts and comments from Same Condition and Kumar directed at Codal and Baxi that he and his company had created.

According to that list, Same Condition and Kumar had commented about Codal and Baxi 69 times from February 17, 2020, to March 2, 2020, on Twitter, LinkedIn, and Google.

¶ 11    For example, in a two-day stretch from February 17 to February 18, 2020, Same Condition tweeted the following from its account:

"@gocodal @mobileappdaily We had a very bad experience with @Gocodal. They charged us hefty amounts and 3 years have passed, wanted to dump a buggy half cooked website on us. We refused and dragged them to court. #Codal"

"@gocodal @AppDevFirms Codal did not complete our project, whatever the software they built for us, was half cooked and full of problems. We had a horrible experience with them. #Codal"

"@AppDevFirms @gocodal @hyperlinkinfo @hashrocket @palantir @orbiteers @myplanet @prometsource @Realnets @educoweb @cre8inc Codal NOT only failed to develop our software platform properly, they usurped our money and refused to listen to our concerns. Left with no option, we had to drag #Codal to a Chicago court. Now Codal playing legal games rather than addressing the issues."

"@AppDevFirms @gocodal @hyperlinkinfo @hashrocket @palantir @orbiteers @myplanet @prometsource @Realnets @educoweb @cre8inc See how #Codal is playing out now! They Blocked us on Twitter. Sir @gocodal, you need to listen to the grievances of your customer rather than blocking. Bad business ethics!"

"My struggle with @goCodal company. They have failed to deliver my product. Codal is technically incompetent. @BuiltinChicago @CrainsChicago @Midwest_loT @1871Chicago @BigTimeSoftware Note: #Codal has blocked our twitter handle."[1]

"@gocodal @Ontraport @buffer @SproutSocial @ahrefs @convertflow @GMktgPlatform @semrush @hotjar @ActiveCampaign Months have passed since we wrote this, but #Codal company of Chicago (@gocodal) refuses to accept that they were not able to provide IT solutions that agreed scope of work required. Surprised that unfair business practices continue. @ExecClubChicago @AnnCDwyer @ChiTribBiz"

Also on February 18, 2020, Kumar posted a Google Review about Codal stating the following:

"We are having a very bad experience with Codal company. We hired Codal about 3 years back to develop a healthcare platform. Time has passed, but Codal has not been able to develop our product so far in a satisfying manner. They were just interested in getting money from us, but in return tried to dump a faulty, buggy and half cooked software on us. Naturally, we refused to accept that. They do not have technical skills to complete our product. Codal has not been a good company to work with as they kept promising one thing, but delivered something else. At some stage, they stopped communicating with us. We had to drag Codal to the court."

Similarly, on February 18, 2020, Kumar posted on LinkedIn stating the following:

"Our Bad experience with Codal (Codal Inc.) Codal is a Chicago-based I.T. company, headed by Keval Baxi [@kevalbaxi]. Our health startup had a really bad experience with Codal. They have usurped our money, but failed to develop the software platform.

---

[1]This Tweet appeared to include a video, as well.

Their technical incompetence was such that when things came to a passe, they even tried to dump a half cooked buggy website on us. We refused to accept that. We had to drag Codal to a local Chicago court. Here too, rather than accepting pitfalls and trying to fix them, Codal is playing legal tactics.

I spoke to one of the employees at Codal (and the recording is with us, our attorney will present that in court at appropriate time), and the guy said: 'You are not alone. Codal has played unfairly with some other clients too. They take up the project and when faced with technical roadblocks, they start buying time and become non responsive.'

All that glitters is not gold. Codal is a classical example. Located in downtown office, they look big, but then indulge in unfair business practices. Another company in Chicago area contacted me recently when they came to know about we filing a lawsuit against Codal.

If any other person/firm had similar experience, pl mail@samecondition.com."

¶ 12    On March 24, 2020, the circuit court granted Same Condition and Kumar's motion for an extension of time to answer Codal's requests to admit but did not discuss any of their online posts. Four months later, Codal sought a preliminary injunction against Same Condition and Kumar to prohibit them from harassing Codal and its employees as well as to require them to remove all defamatory content they had posted on social media since the lawsuit began. In the motion, Codal asserted that Same Condition and Kumar had continued posting "harassing and disparaging comments" to Codal's Twitter account and the accounts of Codal's employees. Additionally, Codal stated that they had created a website—codalsucks.blogspot.com— wherein Same Condition and Kumar further posted defamatory content about Codal and Baxi.

¶ 13    Codal attached to its motion an updated chronological list of the social media posts and comments from Same Condition and Kumar directed at Codal and Baxi and multiple posts from the blog. In one, titled "Codal Sucks," which was apparently written by Kumar because the post begins "[m]y name is Kumar," the post said that "Codal company and its CEO Keval Baxi are very unethical," that they "did not realize that he and his company essentially bled our start up to death," and that they were "playing tactics" in court. According to the post, "this show[ed] their business values and ethics. Will not an ethical business try to address the client's grievance rather than playing mischief? So, this is Codal for you all to see."

¶ 14    In another post, titled "Codal works with United, Yet Deceived A Start up-Why and How?", the post stated: "Readers familiar with our story must be wondering that Chicago-based Codal company that boasts of working with the giants like United Airlines, Pepsi, Motorola and Quickbooks, how come it dumped and cheated a very small start up enterprise like ours!" Codal also attached an affidavit from Clare Bittourna, one of its employees, who averred that she had answered a question on the website Quora in April 2019. But Bittourna asserted that, in June 2020, Kumar responded to that same question with a "lengthy rant" about Codal and that, later in the day, Kumar posted from Same Condition's Twitter account and tagged Bittourna in the post with her legal given and surname. Bittourna stated that these actions made her feel "extremely uncomfortable." Lastly, Codal attached an affidavit from Baxi, who recounted Kumar's actions and asserted:

"At this point, I feel as if I am being personally monitored and tracked. As ridiculous as this may sound, having every post, press release, and blog article from my business attacked, our clients being contacted at all hours of the day, and my staff harassed, it is

not only becoming exhausting to monitor, but it is now moving into the territory of a security concern."

¶ 15    On July 10, 2020, the parties appeared before the circuit court on multiple motions of Codal's, including its motion for a preliminary injunction. Following the hearing, the court struck Codal's motion without prejudice. The hearing was conducted via Zoom videoconference, and there is no report of proceedings in the record on appeal from that hearing. However, Codal claimed in a later filing that, although the court denied its motion, the court nevertheless "instructed" Same Condition and Kumar's attorney "to request that [they] refrain from their defamatory and disparaging practices."

¶ 16    Two weeks later, Codal filed a motion for a temporary restraining order against Same Condition and Kumar to enjoin them from harassing Codal and Codal's employees and from repeating their defamatory, disparaging, and deceptive practices against Codal. In the motion, Codal observed that, in the July 10, 2020, hearing, the circuit court instructed Same Condition and Kumar's attorney to warn Kumar that his behavior would not be tolerated. Yet, according to Codal, no more than two hours later, Kumar posted another defamatory tweet about Codal. In that tweet, a copy of which was attached to Codal's motion, Same Condition, whose Twitter name was now "Startup cheated by Codal," stated: "Credibility is the most important thing in business. Codal may boast of serving big clients like @pepsi, @united, @QuickBooks and @MotorolaUS, but we know @gocodal ruined us by eating away our money and leaving us on the street. Codal's CEO @Kevalbaxi! we need justice." The timestamp from the tweet was July 10, 2020, at 4:18 p.m.

¶ 17    On October 2, 2020, the circuit court entered an order that, in part, denied Codal's motion for a temporary restraining order. But in paragraph 6 of that order, the court ordered that "Pursuant to the Court's inherent authority to manage its cases, Counter-Defendant, Same Condition and Munish Kumar, are prohibited from making any additional posts online regarding Codal. This order is final and appealable pursuant to [Illinois Supreme Court Rule 304(a)]." There is no report of proceedings in the record on appeal from that court date and nothing in the record showing the court made any factual findings when prohibiting Same Condition and Kumar in this manner. In the order, the court also granted Codal leave to file second amended counterclaims.

¶ 18    Codal's second amended counterclaims against Same Condition and Kumar now included 10 counts, including the previous 4 counts for defamation *per se*, defamation *per quod*, a violation of the Deceptive Practices Act (815 ILCS 510/1 *et seq.* (West 2018)), and commercial disparagement against Same Condition and Kumar but also added 3 additional counts of defamation *per se* against Kumar and Same Condition. Among Codal's requested relief was a permanent injunction barring Same Condition and Kumar from publishing additional false statements about Codal's performance under their agreement and, generally, Codal's goods, services, and business. Codal attached to its second amended counterclaims an updated chronological list of the social media posts and comments from Same Condition and Kumar directed at Codal and Baxi. Seven posts, all from Same Condition's Twitter account, were posted after the parties' July 10, 2020, hearing. In Same Condition and Kumar's answer to Codal's second amended counterclaims, they admitted the social media posts were genuine but denied that any of the statements were false.

¶ 19    On October 28, 2020, Same Condition and Kumar filed a notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a) (eff. Nov. 1, 2017) to challenge the circuit

court's order that "imposed an injunction" prohibiting them from exercising their right to free speech indefinitely. Although Same Condition and Kumar conceded the court did not technically grant a preliminary injunction, they argued the court's order was the functional equivalent.

¶ 20                                    II. ANALYSIS
¶ 21                                    A. Jurisdiction
¶ 22        Initially, before addressing the merits of Same Condition and Kumar's contention on appeal, we must discuss our jurisdiction. As we just noted, in Same Condition and Kumar's notice of appeal, they appealed pursuant to Rule 307(a). See *id.* Moreover, in the jurisdictional statement of their appellants' brief, they assert that this is an interlocutory appeal as of right pursuant to Rule 307(a)(1) (Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017)). Under Rule 307(a)(1), an interlocutory appeal as of right may be taken from an order "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." *Id.* Same Condition and Kumar acknowledge that, in paragraph 6 of the circuit court's order from October 2, 2020, it never used the word " 'injunction,' " but they assert that the order, which enjoined their online speech, is akin to an injunction. And therefore, they posit that the order was immediately appealable under Rule 307(a)(1).

¶ 23        Codal, however, argues that the circuit court did not enter an injunction appealable under Rule 307(a)(1), as the court had denied its request for a preliminary injunction. Rather, Codal posits that the court entered a limited order pursuant to its inherent authority to facilitate the efficient administration of litigation and so that Same Condition and Kumar's conduct did not give rise to additional claims associated with the case. Codal highlights that the court's order expressly stated that it was final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). As such, Codal posits that jurisdiction in this appeal is pursuant to Rule 304(a), which, in an action involving multiple parties or multiple claims for relief, permits an appeal "taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." *Id.*

¶ 24        "To determine what constitutes an appealable injunctive order under Rule 307(a)(1)[,] we look to the substance of the action, not its form." *In re A Minor*, 127 Ill. 2d 247, 260 (1989). "Actions of the circuit court having the force and effect of injunctions are still appealable even if called something else." *Id.* Among other things, an injunctive order demands that a party refrain from doing a specific thing, " 'the most common sort of which operate as a restraint upon the party in the exercise of his real or supposed rights.' " *Id.* at 261 (quoting *Wangelin v. Goe*, 50 Ill. 459, 463 (1869)). However, orders that could be characterized as " 'ministerial' " or " 'administrative,' " such as discovery orders and subpoenas, are not interlocutory orders that are appealable as of right because they regulate procedural aspects of a case. *Id.* at 262. "Such orders may be considered noninjunctive because they did not form part of the power traditionally reserved to courts of equity, but, instead, were part of the inherent power possessed by any court to compel witnesses to appear before it and give testimony." *Id.* These orders "do not affect the relationship of the parties in their everyday activity apart from the litigation, and are therefore distinguishable from traditional forms of injunctive relief." *Id.*

¶ 25        In the present case, the circuit court's order prohibits Same Condition and Kumar from doing a specific thing, *i.e.*, posting online about Codal, which operates as a restraint upon them

in the exercise of their real or supposed first amendment rights. See *id.* at 261, 263 (because the circuit court ordered a newspaper "to refrain from 'doing a particular thing'—from publishing the minor's name," "[t]he order operated as a restraint upon the [newspaper] in the exercise of its first amendment rights, real or imagined" and was appealable under Rule 307(a)(1)). Furthermore, because the order restricts what Same Condition and Kumar can do online, it affects the relationship of the parties in their everyday activities apart from the litigation. See *id.* at 262. Although the court used Rule 304(a) language in the order, it was substantively injunctive in nature, and consequently, the order was appealable under Rule 307(a)(1).[2] Practically speaking, however, whether or not we review this case under Rule 304(a) or Rule 307(a)(1), our scope of review of the appeal remains the same, and we must determine whether the court's order was constitutional.

¶ 26                              B. The Circuit Court's Order

¶ 27        We now turn to Same Condition and Kumar's contention on appeal that the circuit court's order that prohibits them from posting anything online about Codal constitutes a prior restraint in violation of their right to free speech under the United States and Illinois Constitutions.

¶ 28        The first amendment of the United States Constitution provides in part that "Congress shall make no law *** abridging the freedom of speech ***." U.S. Const., amend. I. Despite the first amendment's reference to "Congress," the judiciary is also subject to scrutiny under the first amendment. See *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765-66 (1994). The first amendment applies to the states through the fourteenth amendment (*People v. Austin*, 2019 IL 123910, ¶ 30), and generally, it prohibits "the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002). More specifically, the first amendment precludes the government from " 'restrict[ing] expression because of its message, its ideas, its subject matter, or its content.' " *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).

¶ 29        Article I, section 4, of the Illinois Constitution provides in pertinent part that "[a]ll persons may speak, write and publish freely, being responsible for the abuse of that liberty." Ill. Const. 1970, art. I, § 4. Although the free speech clause of the first amendment of the United States Constitution and of the Illinois Constitution are similar, our supreme court has concluded that the Illinois Constitution may afford greater free speech rights than its federal counterpart, though not in every situation. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 446-47 (2006). That is to say, if we find that the circuit court's order in this case is a proper limitation on free speech and thus constitutional under the first amendment, we would then have to analyze the order under the free speech clause of the Illinois Constitution and determine whether, in this case, the Illinois Constitution provides greater free speech rights than the first amendment and barred the order. But we begin with the traditional first amendment principles.

---

[2]We note that, during the briefing stage of this appeal, Same Condition and Kumar sought to file a supplemental brief. In responding to that motion, we observed that the circuit court's order being appealed from contained final and appealable language pursuant to Rule 304(a) and thus should proceed as an appeal under Rule 304(a) rather than being considered an interlocutory appeal under Rule 307(a)(1). However, further research of the record and relevant case law dictates that this appeal proceed under Rule 307(a)(1).

¶ 30    This case involves a prior restraint, which is a " 'judicial order[ ] *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " (Emphasis in original.) *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville B. Nimmer, Nimmer on Freedom of Speech: A Treatise on the Theory of the First Amendment, § 4.03, p. 4-14 (1984)). We review whether a court-ordered prior restraint is constitutional for an abuse of discretion. *In re J.S.*, 267 Ill. App. 3d 145, 147-48 (1994). Within the context of a pending judicial proceeding, prior restraints "ordinarily refer[ ] to a court order (or statute) that limits the press's freedom to publish information about the proceeding." *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 56. But there are instances where a court has imposed a prior restraint on a party to the litigation. See *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 242 (1986) (prohibiting one party in the litigation from communicating with the media about the case); *Flood v. Wilk*, 2019 IL App (1st) 172792, ¶¶ 34-35 (prohibiting a critic of a church from publishing any written communication about the church's employees, staff, and congregants). Prior restraints of speech have long been condemned by courts as "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). To this end, while prior restraints are not unconstitutional *per se*, there is a "heavy presumption" against their constitutional validity. (Emphasis omitted.) *Kemner*, 112 Ill. 2d at 243. And the proponent of such a restraint "carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

¶ 31    Illustrative is *Keefe*, a seminal case on free speech rights and an individual's right to criticize the business practices of another. In the case, a community organization targeted a real estate broker, who allegedly used racially divisive tactics, by distributing leaflets detailing the broker's practices in Westchester, Illinois, the town in which the broker resided. *Id.* at 415-17. The broker sought and obtained an injunction that prohibited the organization from passing out pamphlets, leaflets, or other literature of any kind and from picketing anywhere in Westchester. *Id.* at 417. The case reached the United States Supreme Court, who observed an elementary tenet "that in a case of this kind the courts do not concern themselves with the truth or validity of the publication." *Id.* at 418. The Court noted that the organization's activities "plainly intended to influence [the broker's] conduct" and "engaged openly and vigorously in making the public aware of [his] real estate practices." *Id.* at 419. Even though the organization's activities might have been offensive to the broker and others, the Court concluded that "[n]o prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." *Id.* Accordingly, the Court held that the injunction violated the first amendment and had to be vacated. *Id.* at 420.

¶ 32    While in the past, the expression of speech occurred predominantly in person, in newspaper, in pamphlet, on television, or on radio, today, the expression of speech lives substantially online through social media platforms such as Twitter, Facebook, and Instagram; video streaming websites such as YouTube; message boards such as Reddit; blogs; and others of the like. Although the flow of communication and speech in this case involves the Internet and social media, the principles of the first amendment remain the same. See *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 326, 364 (2010) (observing the "[r]apid changes in technology" and "the creative dynamic inherent in the concept of free expression" and concluding that "[c]ourts, too, are bound by the First Amendment" such that "[w]e must

- 9 -

decline to draw, and then redraw, constitutional lines based on the particular media or technology used" to disseminate speech); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997) (concluding there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]"). When a court orders a prior restraint on speech, our supreme court has concluded that to be constitutional, "the restraint must either contain certain specified procedural safeguards" or it "must fall within one of several narrowly defined exceptions to the doctrine." *In re A Minor*, 127 Ill. 2d at 265.

¶ 33 The first step in analyzing a prior restraint is determining whether the restraint was content based or content neutral. See *Flood*, 2019 IL App (1st) 172792, ¶ 35. A content-based restriction of speech is presumptively unconstitutional and is reviewed under strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). "Government regulation of speech is content based if" it restricts "particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. Conversely, a content-neutral restriction of speech limits the time, place, or manner of speech and is reviewed under intermediate scrutiny. *City of Chicago v. Alexander*, 2017 IL 120350, ¶ 66.

¶ 34 In this case, the circuit court's order prohibits Same Condition and Kumar "from making any additional posts online regarding Codal." The court's order clearly intended to regulate the content of Same Condition and Kumar's speech, namely any online speech involving Codal. In other words, in order to determine whether Same Condition and Kumar violated the court's order, one would have to examine the content of their online posting. See *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (observing that a content-based restriction requires " 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred" (quoting *Federal Communications Comm'n v. League of Women Voters of California*, 468 U.S. 364, 383 (1984))). As such, the court imposed a content-based prohibition on Same Condition and Kumar's speech. See *Bey v. Rasawehr*, 161 Ohio St. 3d 79, 2020-Ohio-3301, 161 N.E.3d 529, ¶¶ 5, 33 (finding that a trial court order that prohibited a party " 'from posting about [the petitioners] on any social media service, website, discussion board, or similar outlet or service' " to be a content-based restriction because "[a] regulation of speech that is 'about' [the petitioners] is necessarily a regulation of the subject matter of that speech").

¶ 35 Although we have concluded that the circuit court ordered a content-based restriction on Same Condition and Kumar's speech, the first amendment nevertheless allows "restrictions upon the content of speech in a few limited areas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992). These areas include, among others, restrictions on obscenity, defamation, advocacy intended and likely to incite imminent criminal conduct, speech essential to criminal conduct, fighting words, child pornography, and true threats. *Alvarez*, 567 U.S. at 717. Even though a content-based restriction on speech is permissible for a few recognized categories, the restriction still must survive strict scrutiny (*Flood*, 2019 IL App (1st) 172792, ¶¶ 36, 43), meaning it must be "necessary to serve a compelling governmental interest and narrowly drawn to achieve that end." *People v. Jones*, 188 Ill. 2d 352, 358 (1999). In other words, the content-based restriction must be "the least restrictive means consistent with the attainment of its goal." *In re D.W.*, 214 Ill. 2d 289, 310 (2005).

¶ 36 In the present case, assuming *arguendo* that there is a compelling government interest in prohibiting Same Condition and Kumar from posting online about Codal, the circuit court's blanket order that they indefinitely refrain from making any additional posts online about

Codal was not narrowly tailored to achieve that interest. There is no doubt from Codal's vantage point that Same Condition and Kumar engaged in a relentless and obnoxious social media campaign against it and Baxi on various platforms, where they not only vocalized their criticisms to the whole world about Codal but also tagged other accounts such as Crain's Chicago Business and the Chicago Tribune's business news account. Yet, as upsetting as these posts were to Codal and Baxi, a court may not enjoin a party from criticizing others "even though [they] find[ ] that criticism distressing." *Flood*, 2019 IL App (1st) 172792, ¶ 42. As this court observed in *Flood*, a business owner could be distressed by an individual complaining about the business's environmental pollution, fearing that such criticism could lead to the business losing money. *Id.* "However, that does not permit the legislature or a court to silence his critics." *Id.*

¶ 37     In *Flood*, this court addressed the constitutionality of a circuit court stalking no-contact order that a pastor of a church obtained against an individual who had made repeated unwanted appearances at the church and repeatedly passed out disparaging leaflets around the church. *Id.* ¶¶ 1-5. As part of the no-contact order, the court prohibited the individual from " 'communicating, publishing or communicating in any form any writing naming or regarding [the pastor], his family, or any employee, staff or member of the [pastor's church] congregation.' " *Id.* ¶ 24. This court concluded that the restriction was content based and observed that it thus was presumptively invalid. *Id.* ¶ 35. We then found that:

> "An injunction that prohibits respondent from writing anything at all about his pastor or any other member of his church congregation—whether flattering or unflattering, fact or opinion, innocuous or significant, and regardless of the medium of communication—certainly would not be that rare case that survives strict scrutiny. It is all but impossible to imagine a factual record that would justify this blanket restriction on respondent's speech." *Id.*

This court therefore held that this part of the no-contact order violated the church critic's first amendment right to free speech, and accordingly, we vacated that part of the order. *Id.* ¶ 46.

¶ 38     Like *Flood*, the circuit court's order in the present case operates as a blanket content-based prior restraint on Same Condition and Kumar's online activity insofar as it relates to Codal, and therefore, there is a heavy presumption that it is unconstitutional. See *Reed*, 576 U.S. at 163-64; *Kemner*, 112 Ill. 2d at 243. In attempting to rebut this heavy presumption, Codal has presented several arguments as to why the restriction is necessary, including that it is needed to ensure an expedient judicial process by preventing additional posts that could result in further claims by against Same Condition and Kumar. As Codal notes in its brief, Same Condition and Kumar's posts were the basis for many of its counterclaims—the most common cause being defamation—the common theme of which was that Same Condition and Kumar's social media posts contained false statements that injured Codal's business and reputation.

¶ 39     Generally, defamatory statements are not constitutionally protected. See *Alvarez*, 567 U.S. at 717. But see *Hadley v. Doe*, 2015 IL 118000, ¶ 33 (discussing narrow exceptions). Despite this, the general rule is that an injunction is "not available to prevent actual or threatened publications of a defamatory character." *Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America, C.I.O.*, 400 Ill. 38, 42 (1948). This general principle of law holds true even if the allegedly defamatory statements could cause a business to suffer financially because "[t]he private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996). The ordinary recourse for the publication of defamatory statements is not a prior restraint but rather civil or criminal proceedings. See *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) ("Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the First Amendment context."). And indeed, Codal is pursuing claims in civil court to redress the alleged defamatory statements made by Same Condition and Kumar.

¶ 40    Despite these general principles, there are very limited exceptions in which an injunction is available to prevent actual or threatened publications of defamation. In *Montgomery Ward*, 400 Ill. at 47-48, our supreme court highlighted two of them. One exception was so-called "trade libel" involving a business defaming the character of a competitor's business, the essence of which "requires some statement of a competitor or business rival, which will take away business and give it to another." *Id.* at 51. The other exception involved " 'constructive coercion' " or " 'effect of force words,' " which involved picketing by labor unions aimed at physically and morally coercing their employers' actions. *Id.* at 47-48. Neither of these exceptions apply, and in particular, the trade libel exception does not apply because there is no evidence that Same Condition and Codal are business competitors. Rather, just the opposite, Codal was in the business of systems integration, information technology consulting and systems development, whereas Same Condition was a start-up creating a web-based, medical patient-centered software application who relied on software development by Codal. And perhaps just as importantly, insofar as the record on appeal shows, the circuit court never made any findings that Same Condition and Kumar's conduct fell within one of these limited exceptions. See *id.* at 45; *Flood*, 2019 IL App (1st) 172792, ¶ 37. With no applicable exceptions to the rule that an injunction is unavailable to prevent actual or threatened publications of defamatory statements, the mere fact that Same Condition and Kumar's further online posting about Codal could lead to additional defamation-like claims by Codal did not justify the court's blanket prohibition of Same Condition and Kumar's online speech in this case.

¶ 41    But imagine this case's procedural posture was different, and the circuit court's injunctive order occurred after a trial on the merits and a judicial determination that Same Condition and Kumar's conduct was defamatory. Could the court then enjoin them from further online speech about Codal? Imagine a scenario where Individual A says that Individual B never graduated from Harvard. Individual B sues Individual A for defamation and wins after a judicial determination that Individual B did graduate from Harvard. A court-ordered prior restraint that Individual A can no longer say in any medium that Individual B never graduated from Harvard could potentially pass constitutional muster. Otherwise, an absurd scenario could follow whereby Individual A could repeat his defamation, forcing Individual B into a never-ending cycle of litigation over the defamatory statements. In this scenario, some remedy beyond suing for defamation might be necessary to deter such a defamer. See *McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015) (observing the problem with a rule that defamation can never be enjoined "is that it would make an impecunious defamer undeterrable").

¶ 42    But there is an important difference between a prior restraint as a preventative measure before trial, as occurred in this case, and a prior restraint as a posttrial remedy to prevent the repetition of statements judicially adjudicated to be defamatory. See *Hill v. Petrotech Resources Corp.*, 325 S.W.3d 302, 313 (Ky. 2010); *Balboa Island Village Inn, Inc. v. Lemen*,

156 P.3d 339, 349 (Cal. 2007). As a posttrial remedy to prevent the repetition of statements judicially adjudicated to be defamatory, this necessarily means that the statements have already been found to be defamatory and thus are not constitutionally protected. See *Alvarez*, 567 U.S. at 717; *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952). "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). And so, multiple courts have concluded that a court may constitutionally enjoin defamation but only the repetition of speech already adjudicated to be defamatory. See *Bey*, 2020-Ohio-3301, ¶ 44 (holding that "a court may enjoin the future publication of allegedly defamatory statements based on their content" constitutionally under the first amendment but "there must first be a judicial determination that the subject statements were in fact defamatory"); *Hill*, 325 S.W.3d at 313 (holding that "an injunction against false, defamatory speech" is constitutional under the Kentucky constitution "but only upon a final judicial determination that the speech is false"); *Balboa Island*, 156 P.3d at 349 (holding that "an injunction prohibiting the defendant from repeating the statements determined to be defamatory" is constitutional under the first amendment and the California Constitution "following a trial at which it is determined that the defendant defamed the plaintiff").

¶ 43     But not everyone agrees that an injunction to bar the repetition of speech already adjudicated to be defamatory is constitutional. See *Kinney v. Barnes*, 443 S.W.3d 87, 99 (Tex. 2014) (holding that "injunctions against future speech following an adjudication of defamation" are unconstitutional under the Texas Constitution and observing "a legally cogent division between mandatory injunctions calling for the removal of speech that has been adjudicated defamatory and prohibitive injunctions disallowing its repetition" as "[t]he latter impermissibly chills protected speech; the former does not"); see also *Sindi v. El-Moslimany*, 896 F.3d 1, 30-35 (1st Cir. 2018) (expressing skepticism that, but ultimately not answering if, a court could constitutionally enjoin the repetition of statements judicially adjudicated to be defamatory); *Fuller*, 810 F.3d at 464-66 (Sykes, J., concurring) (expressing deep skepticism that a court could constitutionally enjoin the repetition of statements judicially adjudicated to be defamatory). Indeed, there are many problems with attempting to craft a narrow, permanent injunction to prohibit the repetition of statements judicially adjudicated to be defamatory. See, *e.g.*, *Sindi*, 896 F.3d at 33 (observing the challenges with "[a]n injunction that prevents in perpetuity the utterance of particular words and phrases after a defamation trial" because "[b]y its very nature, defamation is an inherently contextual tort"); *Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1091 (C.D. Cal. 2012) ("Here, for instance, Plaintiffs seek to enjoin McWilliams from stating that Plaintiffs 'sent thugs, Blackwater operatives, or military special forces to intimidate him.' But this injunction would be worthless if McWilliams could instead simply claim that Plaintiffs had hired the mafia or a street gang to threaten him."); *Kinney*, 443 S.W.3d at 98 ("[g]iven the inherently contextual nature of defamatory speech, even the most narrowly crafted of injunctions risks enjoining protected speech because the same statement made at a different time and in a different context may no longer be actionable," as "[u]ntrue statements may later become true").

¶ 44    The United States Supreme Court has never addressed this precise issue (see *Kinney*, 443 S.W.3d at 94), and we are likewise unaware of an Illinois case addressing this precise issue.[3] Although there is an open question about the constitutional validity of a posttrial injunction barring the repetition of statements judicially adjudicated to be defamatory, the present case only concerns a prior restraint used as a preventative measure before trial, where there has been no judicial determination that any of Same Condition and Kumar's past statements are defamatory. In such cases, the right to free speech trumps allegations that statements are defamatory. See *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." (Emphasis omitted.)). As conceded by Codal, when the circuit court entered its injunctive order against Same Condition and Kumar, it had not addressed the truth or falsity of their online posts. As such, there was no basis for the circuit court to enter such a blanket order prohibiting Same Condition and Kumar from any further online postings about Codal based only on allegations of defamation, commercial disparagement, and the like.

¶ 45    We recognize the constitutionality of posttrial prior restraints are not at issue in this case. However, we highlighted the difference between them and pretrial prior restraints to underscore the constitutional infirmity of a court order prohibiting further speech by a party or parties to litigation based only on allegations of defamation and because Codal has requested such relief in its counterclaims.

¶ 46    In addition to Codal's claim that the circuit court's order barring Same Condition and Kumar from further posting online about it was necessary to avoid further defamation-like claims, Codal also observes that the posts have caused its clients and employees to question their continued association with the company. To this end, Codal asserts that, in the event the litigation proceeds to a trial on the breach of contract and defamation claims, these individuals may be asked to testify as fact witnesses. And Codal argues that Same Condition and Kumar's posts have the demonstrated effect of intimidating these potential trial witnesses. As previously discussed, content-based restrictions of speech may be constitutional to prohibit the expression of speech such as that integral to criminal conduct. *Alvarez*, 567 U.S. at 717. Codal's argument implies that Same Condition and Kumar's online posts were speech integral to criminal conduct, *i.e.*, witness intimidation and harassment. See 720 ILCS 5/32-4(b) (West 2018) (describing the offense of witness harassment).

¶ 47    Even if it could be argued that Same Condition and Kumar's posts have the consequence of intimidating potential trial witnesses, there are multiple issues with this argument. First, as with the posts being potentially defamatory, there has been no judicial determination to this effect yet. See *Flood*, 2019 IL App (1st) 172792, ¶ 39 (rejecting that a church critic's speech was integral to criminal conduct where, in part, the circuit court made no express findings on the matter). And second, merely because past posts could have had that consequence, that is not a justification to suppress *all* future speech by Same Condition and Kumar about Codal. "Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is

___

[3]The United States Supreme Court almost did address this issue when it granted *certiorari* in *Tory v. Cochran*, 544 U.S. 734 (2005), but the death of one of the parties obviated the Court from resolving the issue.

- 14 -

breached." *Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175, 180-81 (1968). The fact that Same Condition and Kumar's postings could intimidate potential trial witnesses does not justify the court's blanket restriction of their speech in this case.

¶ 48    Codal lastly posits that the circuit court's order is proper where the court used its inherent authority to manage its cases with the intent of protecting the parties' right to a fair trial. A party's right to a fair trial is guaranteed by the due process clause of the fourteenth amendment. *Kemner*, 112 Ill. 2d at 244. And occasionally, one party's right to free speech may conflict with another party's right to a fair trial. See *id.* When these two constitutional guarantees collide, the right to free speech occasionally must yield to the right of a fair trial. See *Pennekamp v. Florida*, 328 U.S. 331, 347 (1946) ("Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice."). In order to balance these occasionally competing interests, the circuit court

> "can restrain parties and their attorneys from making extrajudicial comments about a pending civil trial *only* if the record contains sufficient specific findings by the trial court establishing that the parties' and their attorneys' conduct poses a *clear and present danger or a serious and imminent threat to the fairness and integrity of the trial*." (Emphases in original.) *Kemner*, 112 Ill. 2d at 244.

But "any restraining order which denies parties and counsel their first amendment rights in the interest of a fair trial must be neither vague nor overbroad." *Id.*

¶ 49    Here, insofar as the record on appeal shows, the circuit court never made any specific findings that Same Condition and Kumar's conduct posed a clear and present danger or serious and imminent threat to the fairness and integrity of the parties' trial. See *id.* But just as important, the court's blanket order prohibiting any online posting by Same Condition and Kumar about Codal is clearly overbroad. See *id.* It is conceivable that the court could fashion a narrow and limited injunction with respect to Same Condition and Kumar's speech about the current litigation that could pass constitutional muster. See *id.* But the court's order as stated clearly does not, given that it prohibits speech not yet adjudicated to be not constitutionally protected and prohibits speech that eminently would be constitutionally protected, such as (though doubtful based on the parties' current relationship) something flattering and complimentary about Codal.

¶ 50    In *Keefe*, 402 U.S. at 419, the Supreme Court found that "[n]o prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." Technology has enabled our society to move on from pamphlets and leaflets to tweets, Facebook, Instagram and LinkedIn posts, and Google and Yelp reviews. But the basic principles of the first amendment remain the same that a content-based prior restraint must use "the least restrictive means consistent with the attainment of its goal" (*In re D.W.*, 214 Ill. 2d at 310), and the injunctive power of the judiciary cannot be used to silence critics of the business practices of another (see *Keefe*, 402 U.S. at 419). In light of the above, the blanket prior restraint imposed by the circuit court on Same Condition and Kumar's speech is clearly not the least restrictive means possible, and therefore, the court's order violates Same Condition and Kumar's right to free speech and is unconstitutional. Consequently, the court abused its discretion in imposing the prior restraint on Same Condition and Kumar's speech, and paragraph 6 of the court's order from October 2, 2020, must be vacated.

¶ 51    Although we have concluded that the circuit court's prohibition on Same Condition and Kumar is unconstitutional, we do have sympathy for the mental distress and distraction that Same Condition and Kumar's social media campaign has apparently caused Codal, Baxi, and its employees. But they have civil remedies available to them, which they are currently pursuing, and there are criminal remedies for certain, more egregious conduct. See, *e.g.*, 720 ILCS 5/26.5-3 (West 2018) (describing the offense of harassment through electronic communications). As we observed in *Flood*, 2019 IL App (1st) 172792, ¶ 44, courts "cannot silence [a critic] when he is voicing protected criticism, no matter how much time, energy, or distress it costs" another person or other people. Same Condition and Kumar have undertaken the role of the pamphleteer in *Keefe*, and under the first amendment, they are entitled to comment upon the business practices of Codal and their experience with Codal—positive, negative, or indifferent.

¶ 52                                III. CONCLUSION

¶ 53    For the foregoing reasons, we vacate paragraph 6 of the order of the circuit court of Cook County from October 2, 2020.

¶ 54    Order vacated.

- 16 -